IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

GRACE MALDONADO
1232 Schiller Street
Racine, Wisconsin 53403

                    Plaintiff,

      vs.                                 Case No. _____

RACINE COUNTY, WISCONSIN
730 Wisconsin Avenue
Racine, Wisconsin 53403

    and

TONIA PRATHER
1717 Taylor Avenue
Racine, Wisconsin 53403

                    Defendants.

---

## COMPLAINT

---

    The Plaintiff, Grace Maldonado, by her attorneys, Hawks Quindel, S.C., by Aaron N. Halstead and Nicholas E. Fairweather, for her Complaint against the Defendants, states as follows:

### JURISDICTION AND VENUE

    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331.

    Venue is appropriate under 28 U.S.C. § 1391 because Plaintiff resides in the Eastern District of Wisconsin and all of the acts or omissions giving rise to her claims occurred in this district.

## PARTIES

1.　　The Plaintiff, GRACE MALDONADO ("Maldonado"), is an adult resident of the State of Wisconsin, and resides at 1232 Schiller Street, Racine, Wisconsin, 53403. At all material times she was certified as a day care provider by Racine County, Wisconsin, pursuant to Wis. Stat. Chapter 48 and Wis. Admin. Code Chapter DCF 202.

2.　　Defendant RACINE COUNTY (the "County") is a municipal corporation charged with the responsibility of administering a child care certification program for all persons eligible for child care subsidies under the State of Wisconsin's W-2 Wisconsin Works program. The County has designated its Department of Human Services as the department responsible for administering the certified child care program. The County's principal offices are located at 730 Wisconsin Avenue Racine, Wisconsin, 53403.

3.　　Defendant TONIA PRATHER ("Prather") is an adult resident of the state of Wisconsin who was, at all material times, an employee and agent employed by the County. Prather's County office address is 1717 Taylor Avenue, Racine, Wisconsin, 53403. At all times material hereto, Prather acted under color of law of the State of Wisconsin in supervising and administering day care provider certifications, including that issued to Maldonado by the County.

## ALLEGATIONS

4.　　Under Wis. Stat. § 48.651(1), the County is obligated to certify day care providers who meet the requirements of Wis. Stat. §§ 48.155(1d) and 48.685, and who pay the fee specified in § 48.651(2).

5.　　On and before October 21, 2009, Maldonado owned and operated a family childcare center located in her home at 1232 Schiller Street, Racine, Wisconsin, 53403, known as

2

Little Angels Daycare. The County first certified Maldonado's daycare facility in or about February 2005, and thereafter recertified that facility.

6.     At all times following the County's initial certification of Maldonado's daycare facility, Maldonado continued to meet the requirements specified in § 48.651(1) for continuing the operation of her family daycare facility.

7.     At approximately 4:00 p.m., on October 23, 2009, Prather contacted Maldonado and instructed her to shut down her child care business.

8.     Had Maldonado not complied with Prather's demand, she could have been subject to penalties under state law, and so she complied with Prather's demand.

9.     On that same day, Prather contacted all of the parents whose children were enrolled in Maldonado's child care center. Prather told the parents of those children that they needed to find alternative arrangements for their children because there were "problems" with Maldonado's day care. Each of those children was, at that time, a recipient of regular subsidy payments under Wisconsin's W-2 program, which subsidies the State of Wisconsin paid directly to Maldonado as compensation for the child care services she provided to those children as a certified daycare provider.

10.     As the result of the County's erroneous actions, Maldonado's subsidy payments were terminated on October 24, 2009.

11.     Thereafter, following Maldonado's protests over Prather's actions, the County, through its employee and agent, Dawn Ramsey, informed a WICCPT representative that there had been a "misunderstanding" as it regarded Prather's above-described statements and actions.

12.     Maldonado is a child care provider who enjoys rights negotiated on her behalf by American Federation of State, County and Municipal Employees, District Councils 40 and 48,

3

AFL-CIO, Wisconsin Child Care Providers Together, ("WICCPT") with the State of Wisconsin, specifically an Agreement between WICCPT, the Wisconsin Department of Health and Family Services ("DHFS") and the Wisconsin Department of Workforce Development ("DWD"). As of July 1, 2008, the Wisconsin Department of Children and Families ("DCF") assumed from DHFS and DWD all duties and obligations contained in the Agreement.

13.     Article 3, Section D.17 of the Agreement, a copy of which is attached hereto, provides, among other things, as follows: All licensed, certified and provisionally certified family child care providers have:

> The right to have complaints against a provider investigated and substantiated before any enforcement action is taken, unless the State regulator determines that a summary suspension (per HFS 45.11(10)(a)) is required.

14.     At all times material hereto, the investigation and substantiation requirements of Article 3, Section D.17 of the Agreement were binding on the County pursuant to agreements between DCF and the County, as specified in Article 16, Section 6.

## CAUSE OF ACTION: VIOLATION OF RIGHT TO DUE PROCESS OF LAW GUARANTEED BY THE FOURTHEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES OF AMERICA

15.     Paragraphs 1-14 of this Complaint are reiterated as though set forth here in full.

16.     Maldonado had a property interest in the continued receipt of the above-described subsidy payments.

17.     Before Prather engaged in the above-described conduct neither the County nor any other person acting on behalf of it engaged in the investigation and substantiation required by Article 3, Section D.17 of the Agreement.

4

18.     The County, acting under color of state law, has deprived Maldonado of rights guaranteed by the United States Constitution by failing to provide her with due process before depriving her of her property, in violation of the Fourteenth Amendment to the Constitution of the United States of America.

WHEREFORE, Plaintiff demands Judgment against Defendant, awarding her:

A.     The immediate reinstatement of her family child-care certification;

B.     Damages in an amount to be awarded at trial;

C.     All attorney's fees incurred by Plaintiff in prosecuting this action and the costs of this action as provided in 42 U.S.C. § 1988.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

Dated this 21st day of December 2009.

HAWKS QUINDEL, S.C.

By:_____
        Aaron N. Halstead, State Bar No. 1001507
        Email: ahalstead@hq-law.com
        Nicholas E. Fairweather, State Bar No. 1036681
        Email: nfairweather@hq-law.com
        222 West Washington Avenue, Suite 450
        Post Office Box 2155
        Madison, Wisconsin 53701-2155
        Telephone: 608 257-0040
        Facsimile: 608-256-0236

        Attorneys for the Plaintiff, Grace Maldonado

5

Agreement

Between

Wisconsin Department of Health and Family Services and
Wisconsin Department of Workforce Development

And

Wisconsin Child Care Providers Together,
American Federation of State, County and Municipal
Employees,
AFSCME Councils 40 and 48, AFL-CIO

EXHIBIT

PREAMBLE ................................................................................................... 4

ARTICLE 1 – DEFINITIONS .......................................................................... 5

ARTICLE 2 – RECOGNITION ........................................................................ 9

ARTICLE 3 – CHILD CARE PROVIDER BILL OF RIGHTS ....................... 10
A. General Provisions .............................................................................. 10
B. Records and Rules ............................................................................... 10
C. Inspections and Investigations ........................................................... 10
D. Recourse ............................................................................................. 11

ARTICLE 4 – UNION RIGHTS ...................................................................... 12
Section 1. Information from the State ....................................................... 12
Section 2. Participation at Trainings ........................................................ 12
Section 3. Bulletin Board Space ............................................................... 12
Section 4. Neutrality ................................................................................. 12
Section 5. Notices ..................................................................................... 12
Section 6. Policy Changes ........................................................................ 13
Section 7. Union Dues .............................................................................. 13
Section 8. Union Health Care Plan Deduction ......................................... 13
Section 9. Dues Deductions ...................................................................... 13
Section 10. Fair Share .............................................................................. 13

ARTICLE 5 – NON-DISCRIMINATION ....................................................... 15
Section 1. Union Membership and Activity .............................................. 15

ARTICLE 6 – PARENT RIGHTS ................................................................... 16
Section 1. Parent Rights ........................................................................... 16
Section 2. Disputes between Providers and Parents ................................. 16
Section 3. Parent Education ...................................................................... 16

ARTICLE 7 – PAYMENTS AND CO-PAYMENTS ....................................... 17
Section 1. Timely Payments ..................................................................... 17
Section 2. Payments Subcommittee .......................................................... 18
Section 3. Manner of Payment .................................................................. 18
Section 4. Co-Payment Waiver ................................................................. 18

ARTICLE 8 – MAXIMUM REIMBURSEMENT RATES ............................. 19

ARTICLE 9 – GRIEVANCE PROCEDURE ................................................... 20
Section 1. Definition ................................................................................. 20
Section 2. Collaborative Problem-Solving Methodology ......................... 20
Section 3. Grievance Mediation Process .................................................. 20

*Page 2 of 33*

Case 2:09-cv-01173-AEG   Filed 12/22/09   Page 7 of 24   Document 1

Section 4. Eligibility ..................................................................... 21

ARTICLE 10 – HEALTH BENEFITS ............................................ 22

ARTICLE 11 – LIABILITY INSURANCE ...................................... 23

ARTICLE 12 – REGULAR MEET AND CONFER SESSIONS ......... 24
Section 1. Purpose of Meet and Confer sessions ............................ 24
Section 2. Participants ................................................................. 24
Section 3. Inclusion of Other Participants .................................... 24

ARTICLE 13 – EDUCATION AND TRAINING .............................. 25
Section 1. The importance of education and training ...................... 25
Section 2. Access to training and education .................................. 25
Section 3. Joint Education and Training Committee ....................... 25

ARTICLE 14 –QUALITY RATING SYSTEM ................................. 26

ARTICLE 15 – LANGUAGE ACCESSIBILITY ............................... 27

ARTICLE 16 – GENERAL PROVISIONS AND MISCELLANEOUS BENEFITS 28
Section 1. Provider Files ............................................................. 28
Section 2. Printing of the Agreement ........................................... 28
Section 3. Illegally Operating Providers ...................................... 28
Section 4. Equipment Purchases and Capital Improvements ........... 28
Section 5. Income Verification ..................................................... 28
Section 6. Non-State Child Care System Entities ........................... 28
Section 7. Availability of Required Forms ..................................... 29
Section 8. Social Security Numbers ............................................. 29

ARTICLE 17 – SUCCESSORSHIP ................................................. 30

ARTICLE 18 – TERM OF AGREEMENT ....................................... 31
Section 1. Partial Invalidity ........................................................ 31
Section 2. New Resources ........................................................... 31
Section 3. Term of the Agreement ................................................ 31

APPENDIX A ............................................................................. 32

# PREAMBLE

This Memorandum of Agreement (MOA) is between the Wisconsin Department of Health and Family Services (DHFS), the Wisconsin Department of Workforce Development (DWD) – hereinafter referred to as the "State," and Wisconsin Child Care Providers Together, American Federation of State, County and Municipal Employees (AFSCME), Councils 40 and 48, AFL-CIO – hereinafter referred to as the "Union." This MOA is the result of the Governor's Executive Order No. 172, *Directing DHFS and DWD to Meet and Confer With Family Child Care Providers in Order to Improve the Delivery of Quality Child Care Services.* Executive Order No. 172 is attached to this Agreement as Appendix A and made part of this Agreement.

As directed by the Executive Order, the State has met and conferred with the Union regarding issues of mutual concern. As signatories to this Agreement, the Union and the State share a common mission to ensure access to family child care as a quality child care option for families that promotes the safe and healthy development of children.

The State understands that family child care providers are an integral part of the early care and education system, offering working parents the option of a home-based child care setting. The State is committed to assisting family child care providers to meet the highest standards in their programs, through its various funding sources. The State is committed to assuring that family child care providers and their various representatives have the opportunity to participate in the decisions that affect their programs and to professionalism in all their interactions with agents of the State.

The Union understands that the key to quality family child care is an infrastructure that addresses the safety, quality, accessibility and affordability of this regulated child care option. The Union is committed to understanding the varied statutes, rules, and funding sources that govern licensed and certified family child care programs. The Union understands that family child care providers are self-employed business owners who contract directly with parents and set the terms and conditions – within regulatory confines - for the enrollment of children in their family child care centers, including fees and operating hours. As such, the Union is committed to using advocacy and education resources to expand the resources and supports available to the family child care provider industry. The Union and the providers it represents are committed to professionalism in their interactions with the State and its agents.

Provisions in this Agreement that require statutory change or legislative funding will not take effect until such changes and funding are secured and in effect.

Case 2:09-cv-01173-AEG   Filed 12/22/09   Page 8 of 24   Document 1

# ARTICLE 1 – DEFINITIONS

**Administrative Rules** means regulations, standards, statements of policy or orders of general application that have the effect of law and which are issued to implement, interpret or make specific statutes that are enforced or administered by a state agency, or to govern the organization or procedures of a state agency.

**Authorization** means a written statement, regarding payment of a subsidy, between the child care administrative agency (DWD) and a child care provider, indicating the effective dates of the payment authorization, reimbursement amount, and type of payment, as determined by statute and administrative rule.

**Business day** means Monday through Friday, excluding state holidays in effect as of January 1, 2008, for the purpose of counting days needed to respond to any party as noted throughout this Agreement. The specific state holidays referenced are: January 1 (New Year's Day), third Monday in January (Martin Luther King Jr. Birthday observed), last Monday in May (Memorial Day), July 4 (Independence Day), first Monday in September (Labor Day), fourth Thursday in November (Thanksgiving Day), December 24 (Christmas Eve), December 25 (Christmas Day) and December 31 (New Year's Eve).

**Certification** means the process set forth in State law (48.651 Stats) that requires counties/tribes to certify providers who are not required to be licensed but are caring for children eligible to receive the Wisconsin Shares Child Care Subsidy. Most counties have made certification available for all family day care providers, whether or not public funding is involved. DWD Administrative rules establish certification standards for child care providers. Certified providers must comply with DWD 55 Certification Rules, as noted in the table below and the Caregiver Law in 48.685.

| Maximum Number of Children Allowed Under Certification | | | |
|---|---|---|---|
| Number of Children Under 2 Years of Age | Maximum Number of Children Ages 2 Years to 7 Years of Age | Additional Children Ages 7 through 12 (If special needs, up to age 19) may be cared for as long as the maximum number of children is not exceeded | Maximum Number of Children |
| 0 | 3 | | 6 |
| 1 | 3 | | 6 |
| 2 | 3 | | 6 |
| 3 | 3 | | 6 |
| 4 | 2 | | 6 |
| 6 | 0 | | 6 |

| Maximum Number Allowed When Children Under 2 Years of Age are Present | |
|---|---|
| Number of Children Under 2 Years of Age | Maximum Number of Children |
| 0 | 6 |
| 1 | 6 |
| 2 | 6 |
| 3 | 5 |
| 4 | 4 |

[1] The maximum number does not include the provider's natural, adopted or foster children 7 years of age and older.
[2] Under s. 48.65(1), Stats, if a provider takes care of 4 or more children under the age of 7 who are not related to the provider, for compensation, the provider must obtain a license from DHFS BRL to operate a day care center.

---

**Child Care Certifier** means a person employed by a county, a governing body of federally recognized American Indian tribes or an agency under contract with a county or tribe, whose duties include determination of eligibility, monitoring and compliance with chapter DWD 55.

**Child Care Administration contracts** means the annual contracts between State and counties and tribes to administer the child care certification and subsidy programs.

**Complaint**, as it relates to DHFS authority, means an allegation of a violation of Chapter 48, Wis. Stat, and/or HFS 45, Wis. Administrative Code, that requires an investigation and, if confirmed as true, appropriate follow-up action. DHFS investigates complaints within its regulatory authority as they relate to licensed or illegally operating facilities. Following a complaint investigation of a licensed or unlicensed child care provider, DHFS must reach one of two findings for each alleged violation included in the complaint. These findings are "*Substantiated*" and "*Unsubstantiated*."

- *Substantiated* Complaint: means that based on a complaint investigation, a rule violation was issued.
- *Unsubstantiated* Complaint: means that based on a complaint investigation, a rule violation was not issued.

As it relates to DWD authority, **complaint** means an alleged violation of s. DWD 55.08.

**Compliance Statement (CFS-785)** means CFS-785, the form that is used by DHFS licensing specialists during routine monitoring visits to licensed facilities to document that no violations were cited for the selected administrative rules under review at that particular monitoring visit.

**Department of Children and Families (DCF)** means the department created in 2007 Wisconsin Act 20, Section 1267g, whose purpose is "to focus on integrating the child welfare, child care and child support services provided in this state and the services provided under the Wisconsin Works program and on increasing collaboration and efficiency in providing those services."

**Department of Health and Family Services (DHFS)** means the state agency charged with ensuring the health and safety of the people of Wisconsin. Regulation of licensed family child care is one of many programs administered by the agency. As of July 1, 2008, these responsibilities will move to the Department of Children and Families.

**Department of Workforce Development (DWD)** means the state agency charged with building and strengthening Wisconsin's workforce. The Department administers the state's child care subsidy, certification and quality programs. As of July 1, 2008, these responsibilities will move to the Department of Children and Families.

**Executive Order (E.O.) 172** means *Directing DHFS and DWD to Meet and Confer With Family Child Care Providers in Order to Improve the Delivery of Quality Child Care Services.* Signed by Governor Jim Doyle on October 6, 2006, E.O. 172 directs DHFS and DWD to meet and confer with a recognized exclusive majority representative of family child care providers in Wisconsin, to discuss issues of mutual concern and, after meeting and conferring, to enter into a written agreement embodying the agreed upon terms of the parties, to the extent agreement is reached. See Appendix A.

State Regulator means state licensing, subsidy or fraud investigating staff.

Supporting Families Together Association means the Association created in July 2007 that is the umbrella group of the Child Care Resource and Referral agencies and the Family Resource Centers of Wisconsin.

Unregulated child care provider means an individual caring for children who is not required to be licensed in accordance with s. 48.60(1) or 48.65(1), Wis. Stats, because of the number and age of children in care.

Violation, also referred to as a noncompliance, means a formal, written statement that a licensee is not in compliance with a specific administrative rule.

Vital Document means, as defined by DWD, any document, paper or electronic, that contains information critical for accessing provider/agency services and/or benefits; a letter or notice that requires a response from a customer; or a document that informs customers of free language assistance. Written translation of agency vital documents is provided for each eligible language group that constitutes 5 percent of the population of individuals eligible to be served by a DWD program - or 1,000 individuals in a geographic area, whichever is less. If there are fewer than 50 persons in a language group, vital written materials are not translated, but written notice is provided in the group's primary language that notifies them of their right to oral interpretation of those written materials, free of cost. The provision of written translation of agency documents, including vital documents, must be in accordance with an annual agency plan that addresses costs and priorities.

Wisconsin Child Care Resource and Referral (CCR & R) Agencies means the sixteen community-based nonprofit CCR&R agencies, along with a central Network office, that provide core support services including parent referral, child care provider recruitment and statistical data on child care.

Wisconsin Shares means Wisconsin's child care subsidy program, which helps eligible families pay for child care. To qualify for the program, parents must meet the eligibility criteria as set in DWD 56. DWD provides program oversight and automation and contracts program administration to counties and tribes.

Family Child Care Center means a facility in which an individual provides care and supervision for less than 24 hours a day for at least 4 and not more than 8 children who are not related to the provider.

Grievance means a dispute as defined in Article 9 for which a formal resolution concerning the application, meaning or interpretation of this Agreement is desired by AFSCME or the State. The process established in Article 9 may not be used to appeal decisions that are covered by Section 48.715 or decisions rendered pursuant to Chapter 227.

Illegally operating child care provider means an unlicensed provider who is operating a child care program that is required to be licensed in accordance with s. 48.60(1) or 48.65(1), Wis. Stats, because of the number and age of children in care. (See definition of licensure requirement)

Licensee means the corporation, individual, partnership or non-incorporated association or cooperative which has legal and financial responsibility for the operation of a child care program and for meeting the requirements of the child care administrative rule.

Licensure Requirement means the requirement for obtaining a child care license, found in s. 48.65, Wis. Stats, which states that no person may for compensation provide care and supervision for 4 or more children under the age of 7 for less than 24 hours a day unless that person obtains a license to operate a child care center from DHFS.

Noncompliance Statement and Correction Plan (CFS-294) means the form that is used by the DHFS licensing specialists to enumerate and document all violations of administrative rules identified in a licensed facility. The CFS-294 alerts a facility to existing violations and requires prompt, appropriate corrective action to safeguard the children in care.

Public records law, 19.31-19.37 WI Stats, means the law that allows the public to access information that has been filed or recorded by public agencies, such as the state, counties/tribes, certain non-profit agencies, etc. Most public records are accessible to the public either free-of-charge or for an administrative fee. Mental health, juvenile delinquency, Child Protective Services and AODA records are exempt from this law.

Quality Child Care contracts means contracts between the State and entities to carry out investments in quality child care as required by the Child Care Development Fund.

Quality Rating System means a system that awards quality ratings to early care and education programs. Quality Rating Systems are built around five basic elements: standards, accountability measures, program and practitioner outreach and support, financial incentives and parent education.

"Record" means any material on which written, drawn, printed, spoken, visual, or electromagnetic information is recorded or preserved, regardless of physical form or characteristics, and which has been created or is being kept by an authority. Wis. Stat.§ 19.32(2).

Case 2:09-cv-01173-AEG    Filed 12/22/09    Page 10 of 24    Document 1

## ARTICLE 2 – RECOGNITION

The State recognizes the Union as the exclusive majority representative of all licensed, certified and provisionally certified family child care providers in Wisconsin. The Union was selected by a majority of such providers pursuant to Executive Order #172 issued on October 6, 2006, and its exclusive majority status was verified on October 30, 2006. The Union understands and agrees that the State may communicate and consult with other organizations and committees on matters of concern to child care providers and child care services. The State agrees that such communication will in no way diminish or adversely affect the exclusive right of the Union to represent all licensed, certified and provisionally certified family child care providers.

## ARTICLE 3 – CHILD CARE PROVIDER BILL OF RIGHTS

The State, the Union and providers will treat each other with fairness, courtesy, dignity, consideration and respect. All licensed, certified and provisionally certified family child care providers have:

### A. General Provisions

1. The right to be treated as professionals, with courtesy, dignity, consideration, and respect.
2. The right to conduct their business, free from discrimination based upon their race, color, religion, gender, sexual orientation, national origin, political affiliation, disability, marital status, age, or union affiliation.
3. The right to substantially consistent and fair application of the rules among all state regulators.

### B. Records and Rules

4. The right to receive electronic or written notification prior to any changes to state statutes or administrative rules initiated by the State that would alter the monitoring policies or standards that child care providers are subject to and to provide input and feedback on such changes.
5. The right to receive written notification of a decrease or termination of payment, which affects families receiving subsidy.
6. The right to receive any requests, policy change notifications, or any other written communication from the state in the provider's primary language, as required by state or federal law.
7. The right to have access to read, review and make copies, at the provider's expense, of any information in one's own provider file, provided that information is not protected by federal or state law.

### C. Inspections and Investigations

8. The right to have due consideration given to the non-interruption of normal child care operations whenever an unannounced visit occurs. Nothing in this provision shall require the state regulator to leave the family child care center once the regulator has arrived for the unannounced visit.
9. The right to be advised as to the type of visit by a state regulator or agent of the state.
10. The right to require state staff and agents of the state to provide photo identification prior to all visits, as well as to leave a business card that includes their contact information.
11. The right to be informed of the name and contact information of the regulator's supervisor and to discuss the regulator's performance and findings.
12. The right to have a witness of the provider's choosing present to observe and document any visit, provided the visit starts when the state regulator arrives.
13. The right to have an exit interview, at the conclusion of a state regulator's or agent of the state's licensing monitoring visit, that communicates in writing any violations noted, and to be informed of any changes to this report in advance of a final written report being sent.

14. The right to receive a written report of the state regulator's findings listing each observed violation and the specific rule violated, within ten (10) business days of the visit; in a complaint investigation, the right to receive such a report within twenty (20) business days of the conclusion of the complaint investigation.

15. The right to technical assistance by the State, if resources so permit, when the provider receives a monitoring visit that identifies violations.

## D. Recourse

16. The right to respond in writing within 10 business days to licensing violations noted on the Statement of Noncompliance.

17. The right to have complaints against a provider investigated and substantiated before any enforcement action is taken, unless the State regulator determines that a summary suspension (per HFS 45.11(10)(a)) is required.

18. The right, if the provider is able to demonstrate discrimination or bias, to request and be provided an alternate state regulator one time, so long as staffing levels permit.

19. The right to have a union representative present, during any meetings or hearings, so long as this does not delay the interaction.

## ARTICLE 4 – UNION RIGHTS

### Section 1. Information from the State

Every quarter, the State will provide the Union with a list in electronic format of all licensed, certified and provisionally certified family child care providers. The list will be provided at no cost to the Union, and shall include fields showing each active provider's name, provider ID, address, county, city, state, zip, home phone number, regulatory status, date of licensure or certification, licensure or certification expiration date, and, if applicable, Wisconsin Shares ID. If the provider has cared for state subsidized children during the preceding quarter, the list shall also include the amount paid to the provider. Each quarter, the State will specifically identify providers who have ceased to be licensed or certified, as well as new or certified providers.

### Section 2. Participation at Trainings

The State shall give the Union advance notification of all trainings and orientation sessions for licensed family child care providers that the State conducts, and shall encourage any entities providing such trainings and orientation sessions under contract with the State to so notify the Union. At trainings offered by the State, the Union will have up to fifteen (15) minutes prior to and following all such trainings and orientation sessions, on a space available basis, to conduct union orientation, hand out information about the union, and sign up family child care providers as members. The State will advise training providers under contract with the State that the Union should be permitted this same opportunity before and after training, space permitting.

### Section 3. Bulletin Board Space

The State will provide the Union with bulletin board space at State offices where family child care providers regularly visit for work related business. The State shall include a link to the Union's website on its childcare website. This space will be readily visible and accessible to providers.

### Section 4. Neutrality

The State shall remain neutral on the question of Union membership and Union representation for Providers. All questions addressed to the State concerning membership in or representation by the Union will be referred to the Union. The State will insert a neutrality clause in all future contracts with all agents.

### Section 5. Notices

The State will provide the Union with electronic notices that it distributes to family child care providers, adding it to existing electronic listservs and mailing lists.

Case 2:09-cv-01173-AEG   Filed 12/22/09   Page 12 of 24   Document 1

**Section 6. Policy Changes**

Should the State consider any changes to the administrative rules affecting or governing providers, the State shall provide reasonable advance notice, but in no event less than sixty (60) calendar days, and the State agrees to meet and confer with the Union regarding any such anticipated change. The 60 calendar day notice will not apply to Emergency Rules; however, reasonable advance notice will still be required. The State agrees to discuss proposed rule changes with the Union following public hearings and prior to submitting the final rules to the Legislature.

**Section 7. Union Dues**

A. Upon receipt of a voluntary written individual order from any of the child care providers covered by this Agreement who are paid by the State for the care of children covered under the Wisconsin Shares program on forms presently being provided by the Union, the State will deduct from the payment due such child care provider those dues required as the child care provider's membership in the Union. A list of all child care providers from whose pay dues have been deducted shall be sent to the appropriate AFSCME Council in a mutually agreeable electronic format and on a mutually agreeable schedule, including the following information: provider ID, name, home address, county, city, state, zip code, and phone number. At the same time, a copy of said list of child care providers shall also be sent to the appropriate union.

B. Such orders may be terminated in accordance with the terms of the order the child care provider has on file with the State.

C. The State will not deduct from the pay of any family child care provider covered by this Agreement dues or other financial contributions for any other organization.

D. The Union shall indemnify and save the State harmless against any and all claims, demands, suits, or other forms of liability which may arise out of any action taken or not taken by the State for the purpose of complying with the provisions of this Section.

**Section 8. Union Health Care Plan deduction**

When a health care plan for family child care providers is established, the state shall allow child care providers who are covered by this agreement and who are paid by the state for the care of children covered under the Wisconsin Shares program to have their health care premiums deducted using the same process as union dues deduction.

**Section 9. Dues Deduction**

Following ratification of this Agreement, the parties agree to define the business requirements needed to facilitate dues deduction and to reach agreement as to the distribution of initial programming and maintenance charges, if any.

**Section 10. Fair Share**

In the event that statutory law changes permit the State to withhold fair share payments from family child care providers participating in the child care subsidy program, the State and the Union agree to immediately negotiate a fair share fee deduction process.

## ARTICLE 5 – NON-DISCRIMINATION

### Section 1. Union Membership and Activity

No child care provider shall be discriminated against, intimidated, restrained or coerced in the exercise of any rights granted by law or by this Agreement, or on account of membership in, or activities on behalf of the Union.

## ARTICLE 6 – PARENT RIGHTS

### Section 1. Parent Rights

Nothing in this Agreement limits a parent's sole and undisputed right to select and to terminate the services of any child care provider.

### Section 2. Disputes between Providers and Parents

The State agrees to collaborate with the Union on the development of a voluntary dispute resolution process aimed at mediating or resolving disputes between providers and parents.

### Section 3. Parent Education

The parties agree to jointly discuss the creation of educational materials for parents who use, or are considering using, the subsidized child care program. Included in these materials will be specific information related to policies regarding special needs children, including documentation needed to determine the appropriate level of reimbursement.

# ARTICLE 7—PAYMENTS AND CO-PAYMENTS

## Section 1. Timely Payments

The eligibility process flowchart below is current as of [month] 2008. The State agrees to provide the Union with an updated eligibility process should any changes be made during the life of this Agreement.

**Eligibility Process Flowchart**



## Eligibility Process Flowchart, cont.



## Section 2. Payments Subcommittee

The parties have established a subcommittee to resolve issues pertaining to payments and co-payments. It is hereby agreed that those items that have been resolved by subcommittee action are incorporated by reference into this Agreement and are in full force and effect during the term of this Agreement. The subcommittee will continue to meet and attempt to resolve the remaining issues and incorporate those elements resolved into the Agreement. Those issues remaining include accurate payments, notification, and termination of eligibility.

## Section 3. Manner of Payment

The State will continue to make payments either through Electronic Funds Transfer (EFT) directly to the provider's bank account or, if the provider requests, by a check mailed to the provider.

## Section 4. Co-Payment Waiver

The State shall continue to waive contributions from families who are eligible for Food Stamp Employment and Training Child Care and Learnfare Child Care, families who request child care for foster children, and court ordered kinship care children.

Case 2:09-cv-01173-AEG   Filed 12/22/09   Page 15 of 24   Document 1

# ARTICLE 8 – MAXIMUM REIMBURSEMENT RATES

A Market Rate Survey shall be completed annually.

The State shall share Market Rate Survey materials with the union. The State encourages the Union to work with providers to increase the survey return rate.

The State shall use the results of the Market Rate Survey to adjust maximum reimbursement rates. Subject to the availability of funds, the State shall set the maximum reimbursement rate at the 75th percentile of the licensed private child care market rates, as reported in the annual Market Rate Survey.

The subsidy program shall continue to pay a higher rate (ten percent (10%) more than the maximum county/tribal rate) to child care programs that demonstrate that they have met a higher quality of care standard.

For purposes of paying the higher rates, the subsidy program shall continue to use accreditation as the proxy measure for a higher quality of care standard. For the higher rate to apply, a licensed family home must be accredited by the National Association of Family Child Care (NAFCC) or hold a Child Development Associate (CDA) Credential for Family Child Care from the National Council for Early Childhood Professional Recognition (NCECPR). The City of Madison administers its own accreditation program for Dane County providers who meet higher City standards. These providers are paid up to 10% more than the maximum county/tribal rate.

# ARTICLE 9 – GRIEVANCE PROCEDURE

## Section 1. Definition

A grievance means a dispute involving the interpretation and application of the terms of this Memorandum of the Agreement (MOA) pursuant to Executive Order 172.

## Section 2. Collaborative Problem-Solving Methodology

The State of Wisconsin and AFSCME Councils 40 and 48 (Child Care Providers Together), as signatories to the Memorandum of Agreement, encourage the resolution of problems regarding the application, meaning or interpretation of the terms of the MOA by utilizing informal problem-solving methods through regular collaborative meetings. Any family child care provider who is a dues paying member of AFSCME's Child Care Providers Together (CCPT) may submit a problem covered by the terms of this MOA for resolution to the collaborative problem solving process. The parties will endeavor to resolve all of the elements of the pending issue collaboratively. If after thirty (30) days, the issue has not been resolved, a formal grievance may be submitted thereafter according to the steps laid out in Section 3. The parties may mutually agree to extend the thirty (30) day time limit in order to promote additional time for collaborative problem-solving resolution.

## Section 3. Grievance Mediation Process

AFSCME or the State of Wisconsin may determine that any matter deemed unresolved, as described in Section 2 above, may be submitted to the other party as a formal grievance after failing to reach a satisfactory resolution in section 2. The written grievance will contain the following:

1. A statement of the issue(s) and the relevant facts, along with supporting documentation;
2. The specific provision(s) of the MOA that is at issue; and
3. The resolution sought.

The initiating party will request a meeting of an ad hoc Grievance Mediation committee within thirty (30) calendar days after receipt of the formal grievance, which will review the specifics of the dispute de novo. The Grievance Committee will be comprised of one (1) State representative and one (1) Union representative and one (1) third party neutral agreed to by the State and the Union. Any costs related to the participation of the neutral party shall be split equally between the Union and the State. The parties will pay the costs of their own representation to this Committee.

The Committee will develop procedures for facilitating the review process. The time limits set forth above may be extended by mutual agreement. The Committee shall have the authority to render a decision concerning the interpretation and application of all provisions of this MOA. A vote may be taken by the Committee at the conclusion of its deliberation. A majority vote of the Committee will be final and binding on the parties and shall not conflict with existing statute or Administrative Rule. Within fifteen (15) business days, the Committee will submit a written

summary of its recommendation. The dissenting party may issue a dissenting opinion to the written recommendation.

## Section 4. Eligibility

Access to the above procedure will be limited to members of AFSCME CCPT, representatives of AFSCME CCPT and representatives of the State Department of Children and Families and its successors. Any licensed or certified family child care provider who is not a member of CCPT must join the Union and be considered a member in good standing prior to being permitted access to this procedure.

## ARTICLE 10 – HEALTH BENEFITS

The parties will work together on ways to make comprehensive health insurance coverage accessible and affordable for family child care providers. The parties shall convene a joint committee following ratification of this agreement, if necessary or if the goals of this committee have not been met through the quarterly Meet and Confer process by July 1, 2009, to review options for such coverage. The committee shall be comprised of representatives for each side as selected by each party, and each party shall designate one of its representatives to be a co-chair of the committee.

The Joint Committee:

A. May make requests for data and information from agencies of the State, the Union and other entities in order to analyze and determine the cost of various forms of health coverage.

B. May seek information concerning the experience of other states that have established health plans for family child care providers.

C. May request the assistance and advice of experts in the field of health insurance.

D. Shall make a report to the full Meet and Confer committees of the parties to this Agreement no later than six (6) months after the Committee has convened. Such report may include recommendations for legislative or rule changes or appropriations to be sought, and/or for contractual changes to be sought in the successor to this Agreement.

## ARTICLE 11 – LIABILITY INSURANCE

The parties shall convene a joint committee following ratification of this agreement, if necessary, to explore the possibilities of purchasing liability insurance on a group rate basis. The committee shall be comprised of representatives for each side as selected by each party, and each party shall designate one of its representatives to be a co-chair of the committee. The joint committee shall issue a report stating its findings and recommendations to the full Meet and Confer committees of the parties no later than six (6) months after the Committee has convened.

The parties shall meet after receiving the recommendations from the joint committee and shall negotiate over the implementation of any of the recommendations if necessary.

## ARTICLE 12 – REGULAR MEET AND CONFER SESSIONS

**Section 1. Purpose of Meet and Confer sessions**

The State and the Union agree to meet and confer on a quarterly basis. Such meetings shall include issues of mutual concern, such as proposed changes to permanent administrative rules, quality standards, training and certification requirements, reimbursement and payment procedures, health and safety conditions, the monitoring of family child care centers, licensure and other fees, matters and regulations that would encourage certified providers to become licensed and improve the quality of programs they offer, and the implementation of provisions of this Agreement. The parties agree that standing agenda items for the Meet and Confer sessions shall include but not be limited to: education and training, health insurance and liability insurance. The parties further agree to use the Meet and Confer sessions to continue discussion regarding a large family child care category. The parties shall reduce agreements reached during such meet and confer sessions to writing. The parties agree to use the Meet and Confer process to establish committee priorities and timelines. The parties further agree to use the Meet and Confer process to discuss establishing priorities and timelines for the implementation of the terms of this Agreement in recognition of available resources.

**Section 2. Participants**

Up to ten (10) representatives from the Union and up to an equal number of State representatives may attend the meetings.

**Section 3. Inclusion of Other Participants**

The State or the Union may request that other participants be included in a meet and confer session to address a specific issue.

Case 2:09-cv-01173-AEG   Filed 12/22/09   Page 18 of 24   Document 1

## ARTICLE 13 – EDUCATION AND TRAINING

### Section 1. The importance of education and training

The Union and the State both recognize the importance of education and training in relation to the continuity and quality of child care. The Union and State will work together to promote appropriate education and training.

### Section 2. Access to training and education

To maximize the opportunities for family child care providers to attend classes, the State shall encourage training providers with whom it contracts to offer required training on a variety of days (including weekends), and at a variety of times and locations around the state. Efforts to provide training via alternative delivery methods will be encouraged and supported by the State, which will also encourage training providers to offer courses in Spanish and Hmong where appropriate.

### Section 3. Joint Education and Training Committee

The parties agree to establish a joint education and training committee, if necessary or if the quarterly Meet and Confer process cannot accommodate a full discussion of these issues. The joint committee shall:

a.  Study methods of bringing providers and licensors together for joint training on rules to increase consistency and understanding.

b.  Explore additional funds or grant monies to pay for education and training, and explore methods of increasing the number of trainers with experience as family child care providers.

## ARTICLE 14 – QUALITY RATING SYSTEM

The Union and the State believe that all children deserve access to high quality early care and education, and that Wisconsin families would benefit from a statewide Quality Rating System. The Union and the State agree to discuss the design and implementation of a Quality Rating System.

Case 2:09-cv-01173-AEG   Filed 12/22/09   Page 19 of 24   Document 1

## ARTICLE 15 – LANGUAGE ACCESSIBILITY

The State shall ensure that all parents, children and providers, regardless of their language skills, are provided meaningful access to information on the family child care programs and services it provides.

Within the confines of current state and federal law, and if additional resources are made available, the State shall:

- Evaluate the language needs of those served by their programs on an ongoing basis, and periodically discuss these needs with the Union at the regular Meet and Confer sessions;

- Design an effective limited English proficient policy for the child care programs;

- Monitor and update the limited English proficient policy as needed;

- Train staff;

- Notify limited English proficient persons of their right to language services; and,

- Provide competent language services free of cost, such as:

  Communication with bilingual staff
  Oral interpretation by qualified staff, volunteer or telephone interpreters
  Translation of written materials including vital agency materials

## ARTICLE 16 – GENERAL PROVISIONS AND MISCELLANEOUS BENEFITS

### Section 1. Provider Files

A provider shall have access to read, review and make copies of any information in the files concerning the provider maintained by the State, excepting instances specifically prohibited by state or federal law. A provider may be accompanied by a Union representative during this process and/or may authorize the Union to have access to such files. A provider has the right to respond to complaint findings as described in Article 3, Provider Bill of Rights, including having such rebuttals placed in the provider's file.

### Section 2. Printing of the Agreement

The State and the Union shall proof this Agreement prior to the printing and distribution. Any material put into the printed Agreement that is not initialed and proofed by the State and the Union will be considered invalid and not a part of this Agreement.

The printing shall be completed by the Union within thirty (30) days following the ratification. Should the Union post the Agreement to its website, the State agencies shall post a link to this Agreement on their websites.

### Section 3. Illegally Operating Providers

The State shall share its plan for dealing with illegally operating family child care providers with the Union.

### Section 4. Equipment Purchases and Capital Improvements

The parties shall jointly explore additional funds and grant monies to enhance the amounts available to providers for equipment purchases and capital improvements.

### Section 5. Income Verification

Upon the request of a Provider, the Union, or any third party with the written authorization of the Provider, the State shall provide written verification of past payments to the provider and the provider's participation in the Wisconsin Shares program.

### Section 6. Non-State Child Care System Entities

Certified Child Care Administration Contracts – County and Tribes:
DWD agrees to develop language for its Calendar Year 2009 Child Care Administration Contracts that will address Article 3 Sections A, B (6) and (7), C and D and Article 4, Sections 2 and 4 as to how these sections apply to County and Tribal child care administration practices. The language will be shared with the union no later than September 1, 2008. The relevant contract provisions will be incorporated by reference into the Agreement.

Case 2:09-cv-01173-AEG   Filed 12/22/09   Page 20 of 24   Document 1

Quality Child Care Contracts:

DWD agrees to develop language for Calendar Year 2009 Quality Child Care Contracts that will address Article 4, Sections 2 and 4 as to how those sections apply to Quality Child Care Contracts. The language will be shared with the union no later than September 1, 2008 and will be incorporated by reference into the Agreement.

### Section 7. Availability of Required Forms

All required licensing, certification and Wisconsin Shares forms shall be available both in print and electronic formats.

### Section 8. Social Security Numbers

The State shall not disclose a provider's Social Security Number to parents.

## ARTICLE 17 – SUCCESSORSHIP

The terms and provisions of this Agreement shall bind all successors to the operations of the State agencies that are parties to this Agreement to such terms and provisions to which family child care providers are and shall be entitled under this Agreement.

Case 2:09-cv-01173-AEG   Filed 12/22/09   Page 21 of 24   Document 1

# ARTICLE 18 – TERM OF AGREEMENT

## Section 1. Partial Invalidity

Should any part of this Agreement or any provision contained herein be declared invalid by operation of law or by any tribunal of competent jurisdiction, such invalidation of such part or provision shall not invalidate the remaining portions hereof and they shall remain in full force and effect. In such event, upon the request of either party, the State and the Union agree to immediately negotiate with respect to substitute provisions for the invalidated provisions or portions thereof.

## Section 2. New Resources

In the event that the State receives additional Child Care and Development Block Grant or Child Care Development Fund funds, or other Federal child care funds, or other federal undesignated social service funds, the parties agree to Meet and Confer for the limited purpose of discussing how such funds may be used. Moreover, if funds are subject to a reduction, such action shall also be subject to this process.

## Section 3. Term of the Agreement

This Agreement shall remain in full force and effect until June 30, 2011. Thereafter, it shall automatically renew itself from year to year unless either party gives written notice to the other at least 60 days prior to the expiration date of its desire to amend, add to or subtract from this Agreement.

# APPENDIX A

[Executive Order Number 172]

# The State of Wisconsin

## OFFICE OF THE GOVERNOR

**EXECUTIVE ORDER # 172**

Directing DHFS and DWD to Meet and Confer With Family Child Care Providers in Order to Improve the Delivery of Quality Child Care Services

WHEREAS, the State of Wisconsin Department of Health and Family Services and the State of Wisconsin Department of Workforce Development are empowered to establish and maintain standards for the delivery of quality child care services provided in family child care centers. These standards include regulation and licensing of family child care centers and the establishment of reimbursement rates for family child care providers who deliver publicly subsidized care in the Wisconsin Shares program; and

WHEREAS, family child care providers deliver essential services to thousands of low-income Wisconsin children and families as part of Wisconsin Shares, the State's child care assistance program; and

WHEREAS, the number of families and children served under the Wisconsin Shares program has increased significantly over the past six years, from 17,990 families and 32,029 children in January 2000 to 30,745 families and 55,413 children in January 2006; and

WHEREAS, over 35% of all children receiving child care in the Wisconsin Shares program were served by family child care providers in 2005; and

WHEREAS, the number of licensed family child care providers has gradually increased over the last five years in Wisconsin, but turnover among family child care providers has been significant, with nearly 15% of licensed family child care centers closing in 2005, and an even higher turnover rate among certified providers; and

WHEREAS, in order to promote access to quality child care and increase parental choice of providers, there is a need to stabilize the child care workforce and to ensure that licensed and certified family child care centers reach higher quality standards; and

WHEREAS, the Quality Counts for Kids Task Force recommended a Quality Rating system to fit both licensed group child care centers and licensed and/or certified family child care, and also recommended that a statewide professional development system be created for early care and education personnel; and

WHEREAS, licensed and certified family child care providers are located throughout Wisconsin and usually work hours which may prohibit them from effectively voicing their common concerns about child care regulation and the child care assistance program, their role in the program, or the terms and conditions of their provision of services under the program without representation; and

WHEREAS, it is important for the State of Wisconsin to receive input from a majority of family child care providers in order to improve the delivery of quality child care services and to learn about issues that discourage child care

---

**FOR THE UNION:**

_Richard Badger_
Richard Badger
Executive Director
AFSCME Wisconsin Council 40

Date: 7-21-08

_Richard W. Abelson_
Richard W. Abelson
Executive Director
AFSCME Wisconsin Council 48

Date: 7/21/08

**FOR THE STATE:**

_Reggie Bicha_
Reggie Bicha
Secretary
Department of Children and Families

Date: 7/21/08

_Roberta Gassman_
Roberta Gassman
Secretary
Department of Workforce Development

Date: 7/21/08

_Karen E. Timberlake_
Karen E. Timberlake
Secretary
Department of Health Services

Date: 7/21/08

Case 2:09-cv-01173-AEG   Filed 12/22/09   Page 23 of 24   Document 1

providers from continuing in the field and/or becoming licensed through the state's licensing program; and

WHEREAS, it is desirable to have family child care providers select a representative to meet and confer with the State on their behalf on issues that affect the delivery of quality child care services for children in the child care assistance program and issues that affect their livelihood;

NOW, THEREFORE, I, JIM DOYLE, Governor of the State of Wisconsin, by virtue of the authority vested in me by the Constitution and Laws of the State of Wisconsin, do hereby:

1. Direct the Secretary of the Department of Health and Family Services (DHFS) and the Secretary of the Department of Workforce Development (DWD) to meet and confer with a recognized exclusive majority representative of family child care providers in Wisconsin, as selected by a majority of all licensed, certified and provisionally certified family child care providers. The verification of exclusive majority status shall be based on signed authorization cards, and shall be conducted by a neutral third party who is mutually acceptable to the parties. Any cost associated with verifying majority status shall be borne by any organization seeking majority status. DHFS and DWD shall provide the neutral third party with a record of licensed, certified and provisionally certified family child care providers covered by the Executive Order; and

2. Direct that, in meeting and conferring with the authorized representative of family child care providers, the Secretary of DHFS and the Secretary of DWD shall discuss issues of mutual concern, including quality standards, training and certification requirements, reimbursement and payment procedures, benefits, health and safety conditions, the monitoring and evaluating of family child care providers, licensure and other fees, and any other matters and regulations that would improve recruitment and retention of qualified family child care providers, encourage certified providers to become licensed and improve the quality of the programs they offer; and

3. Direct that, after meeting and conferring pursuant to paragraph 2, the Secretaries of DHFS and DWD shall enter into a written agreement embodying the agreed upon terms of the parties, to the extent agreement is reached on any of the possible issues. The Agreement shall reflect the parties' mutual understanding concerning the issues discussed in accordance with paragraph 2 above. Any agreement that requires a rule-making or statutory change will be contingent upon the successful completion of such regulatory or legislative action. If any provisions of the agreement require legislative action, or require the appropriation of funds to be effective, the parties will jointly seek the enactment of such legislative action. If any provisions of the agreement require the adoption or modification of rules and regulations of any department or agency shall seek the adoption or modification through the appropriate regulatory process.

4. General Provisions.

a. Nothing in this Executive Order shall be construed to infringe upon the existing relationship between consumers and family child care providers, including parental rights to select and deselect family child care providers.

b. This Executive Order is not intended to create any contractual rights or obligations. It is intended solely as executive direction to the state agencies identified herein. Nothing in this Executive Order is intended to give to family child care providers, or imply that family child care

providers have, any right to engage in a strike or a collective cessation of the delivery of family child care services. Nothing in this Executive Order is intended to provide any entity with third-party beneficiary rights.

c. Nothing in this Executive Order shall be construed to preclude anyone from meeting and/or conferring with the Secretaries of DHFS and DWD.

d. Family child care providers are not employees or agents of the State. Nothing in this Executive Order is intended to alter the existing relationship between family child care providers and the State or in any way imply an employer-employee or principal-agent relationship.

e. In connection with this Executive Order, the "State Action" exemption to federal antitrust laws shall be fully available to the State, family child care providers and the Exclusive Representative, and exempt conduct shall be actively supervised by the Executive through DHFS and DWD.

f. Nothing in this Executive Order shall be construed to contravene any applicable state or federal law.



IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Great Seal of the State of Wisconsin to be affixed. Done at the Capitol in the City of Madison this _____ day of October in the year two thousand and six.

JIM DOYLE
Governor

By the Governor:

DOUGLAS LA FOLLETTE
Secretary of State